## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EMILE MAZLOUM,**<br>4910 Ravensworth Road<br>Alexandria, Virginia 22003<br><br><br><br>**Plaintiff,**<br><br><br>**v.**<br><br><br>**DISTRICT OF COLUMBIA,**<br>**Serve:** District of Columbia Mayor<br>Office of the Secretary<br>Gladys Herring<br>John A. Wilson Building<br>Suite 419<br>350 Pennsylvania Avenue NW<br>Washington, D.C. 20004<br><br>District of Columbia Attorney General<br>Darlene Fields<br>441 Fourth Street N.W.<br>6th Floor South<br>Washington, D.C. 20001<br><br><br>**ANTHONY RAMIREZ,**<br>Badge No. 2038<br>c/o D.C. Metropolitan Police Department<br>First District Station<br>415 4th St. S.W.<br>Washington, D.C. 20024<br><br>**NIGHT AND DAY MANAGEMENT, LLC,**<br>**d/b/a FUR NIGHTCLUB,**<br>33 Patterson Street, N.E.<br>Washington, D.C. 20002<br><br>Registered Agent:<br>Simon M. Osnos<br>2440 Virginia Ave., NW<br>#D-1304 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action No. 1:06 CV 00002 (JDB)**

**Jury Trial Demanded**

Washington, D.C.  20037 )
)
**MICHAEL REHMAN, a/k/a "MIKE** )
**ROMEO",** )
12001 Galena Road )
Rockville, Maryland  20852 )
)
)
**MICHAEL PERSONS,** )
2602 Brinkley Road )
#410 )
Fort Washington, Maryland 20744 )
)
)
**THADDEUS MODLIN,** )
c/o D.C. Metropolitan Police Department )
First District Station )
415 4th St. S.W. )
Washington, D.C.  20024 )
)
)
**RICHMOND PHILLIPS,** )
c/o D.C. Metropolitan Police Department )
First District Station )
415 4th St. S.W. )
Washington, D.C.  20024 )
)
)
**LOUIS SCHNEIDER,** )
c/o D.C. Metropolitan Police Department )
First District Station )
415 4th St. S.W. )
Washington, D.C.  20024 )
)
)
**JOSE ACOSTA,** )
c/o D.C. Metropolitan Police Department )
First District Station )
415 4th St. S.W. )
Washington, D.C.  20024 )
)
**DAVID SMITH** )
c/o D.C. Metropolitan Police Department )
First District Station )
415 4th St. S.W. )
Washington, D.C.  20024 )

2



and                                                        )
                                                           )
                                                           )
**JOHN FIORITO,**                                          )
2701 Calvert Street N.W.                                   )
Apt. #702                                                  )
Washington, D.C. 20008,                                    )
                                                           )
                    **Defendants.**                        )
                                                           )
_____)

## FIRST AMENDED COMPLAINT

Plaintiff Emile Mazloum hereby alleges as follows:

### NATURE OF THE CASE

1.      This is an action arising under the Constitution and the civil rights laws of the

United States, 42 U.S.C. §§ 1981, 1983, and 1985, the District of Columbia's Human Rights Act,

D.C. Code §§ 2-1401.01 *et seq.* (the "DCHRA"), as well as the common law of assault and

battery, negligence, civil conspiracy, reckless/negligent spoliation of evidence, aiding and

abetting the spoliation of evidence, and liability premised on the doctrine of *respondeat superior*.

2.      As alleged in greater detail below, on the night of March 11-12, 2005 plaintiff

Emile Mazloum, a person of Arabian ethnicity, was the victim of a vicious beating perpetrated

by off-duty D.C. Metropolitan Police Department officers in conjunction with the existing

security detail at the FUR Nightclub in Washington, D.C. (the "Nightclub"). Police officers

Anthony Ramirez and one or more other officers who happened to be patrons of the Nightclub at

the same time Mr. Mazloum was in attendance (Officers Thaddeus Modlin, Richmond Phillips,

and Louis Schneider), took it upon themselves to arrest and eject Mr. Mazloum. In so doing,

they employed excessive and unnecessary force, while identifying themselves as police officers,

thus invoking their official authority as justification for the beating to which Mr. Mazloum was

subjected. In the process, Mr. Mazloum's Lebanese national origin, race and perceived religion

3

were also disparaged, as he was the recipient of verbal epithets accusing him of being an "Al Qaeda."

3.    Thereafter, when it became evident that Mr. Mazloum had in fact done nothing warranting the assault just delivered against him, the MPD and its officers conspired with the Nightclub to cover up the incident—refusing Mr. Mazloum's reasonable efforts to file a complaint, destroying critical evidence, and ultimately threatening Mr. Mazloum and his friends with retaliation should they endeavor to exercise their rights in connection with this incident. This incident occurred against a backdrop of long-standing police brutality and use of excessive force by officers of the MPD, and a failure by that department to properly oversee, train, and/or control the conduct of its officers.

4.    As a result of the above, Mr. Mazloum has suffered serious physical and emotional injuries, has incurred medical expense and loss of earnings, and his constitutional, statutory and common law rights have been violated.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367.

6.    Venue is proper in this Court under 28 U.S.C. § 1391, because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district. For the same reason, the court has personal jurisdiction over the Defendants.

### THE PARTIES

7.    Emile Mazloum is an individual residing at 4910 Ravensworth Road, Annandale, Virginia 22003. Mr. Mazloum is a Lebanese citizen of the Arab race and is a legal permanent resident of the United States.

4

8.      The District of Columbia is a municipal corporation.  The D.C. Metropolitan Police Department (the "MPD") is a department of the District of Columbia.

9.      Defendant Night and Day Management, LLC ("N & D"), d/b/a Fur Nightclub (hereinafter referred as "Fur Nightclub" or "the Nightclub") is a limited liability company incorporated under the laws of the District of Columbia since 2002.  N & D owns and operates the FUR Nightclub, which is located at 33 Patterson Street, N.E. in the District of Columbia.

10.     Defendants Anthony Ramirez, Thaddeus Modlin, Richmond Phillips, and Louis Schneider are officers of the MPD who were acting in an off-duty capacity at FUR Nightclub in the early morning hours of March 12, 2005.

11.     Defendant Michael Persons was at all relevant times employed as a bouncer at Fur Nightclub.

12.     Defendant Officers Jose Acosta and David Smith are officers of the MPD who comprised a squad car team at all times relevant hereto.

13.     Defendants Michael Rehman a/k/a "Mike Romeo" and John Fiorito are, upon information and belief, managers of FUR Nightclub.  At all times relevant hereto, they acted within the scope of their employment.

<b>FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS</b>

<i><b>The Metropolitan Police Department's pattern and practice of excessive use of force.</b></i>

14.     In 1999, following an in-depth five part expose in the *Washington Post*, the District of Columbia requested that the U.S. Department of Justice (USDOJ) investigate the use of force within the department.  The result of that investigation was a finding – never disputed by the District – that there existed a pattern and practice of excessive force and unnecessary force by officers of the MPD (the incidence of such uses of force being 14-15 times the national average

5

found in well-managed police departments) and that a significant portion of those incidents occurred (as herein) in the context of off-duty officers drinking in a bar or nightclub. In 2001, the District and USDOJ entered into a Memorandum of Agreement, pursuant to the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. §14141) whereby the District acknowledged the need for reform in the way in which it investigates, monitors and manages use of force issues and undertook to take numerous steps to attempt to improve the performance of the Metropolitan Police Department in that regard. As of March, 2005, however, there continued to exist a pattern and practice of excessive and unnecessary force.

### *Events at FUR Nightclub on the night of March 11-12, 2005*

15.     On March 11, 2005 at around 10:00 p.m., Plaintiff Mazloum traveled from his home in Northern Virginia to the Nightclub in the District of Columbia. Mazloum had been a patron at the Nightclub on several prior occasions without incident. Upon information and belief, the Nightclub is managed on-site by Defendants Rehman ("Mike Romeo") and John Fiorito. Upon information and belief, Defendant Fiorito is a former MPD officer and continues to maintain close relations with individual officers presently employed by the MPD.

16.     Accompanying Mr. Mazloum to the Nightclub were his friends Marwan Abi-Aad and Imad Alkadi, both of whom worked at the Nightclub in a security capacity for a party promoter known as "Massoud." As party promoters, they receive remuneration for encouraging individuals to patronize the Nightclub. Neither Alkadi nor Abi-Aad worked as "bouncers" at the Nightclub. The Nightclub employed its own bouncers, who were dressed in dark suits and wore radio ear pieces.

17.     On the night of March 11-12, 2005, there were several hundred people in attendance to dance and see a fashion show on a stage in one of the Nightclub's rooms. There

6

were a number of people up on the stage dancing, including Mr. Mazloum. Access to the stage

was possible only via a staircase that was manned at the top and bottom by security guards, who

opened and closed a chain rope to let people access the stairs. Because of his relationship to

Messrs. Abi-Aad and Alkadi, who were at the time assisting security in determining who would

be permitted stage access, Mr. Mazloum could easily move on or off the stage.

*The Assault by the Off-Duty Police Officers*

18.    At some point after midnight, in the early morning hours of March 12th, Mr.

Mazloum determined that he wished to depart the stage. Accordingly, he waited at the top of the

stairs while people came up. However, as he began to go down the stairs, one of the uniformed

security guards manning the stage grabbed him from behind. Mr. Mazloum had no idea who had

grabbed him, and tried to turn around to see. Mr. Mazloum's friend Mr. Alkadi was on-stage at

the time, however, and saw the Nightclub bouncer (Michael Persons) grab Mr. Mazloum.

19.    Mr. Alkadi tried to intercede on Mr. Mazloum's behalf and told Defendant

Persons that Mr. Mazloum had permission to be on stage, and that the bouncer should

accordingly release Mr. Mazloum. As Persons was taking Mr. Mazloum down the stairs from

the stage, Mr. Alkadi and Persons bumped into each other and all three fell to the floor.

20.    At this point, Defendant Ramirez and some combination of Defendants Modlin,

Phillips, and Schneider – both off-duty MPD officers who were also club patrons present at the

Nightclub that evening - interceded in the incident, while Mr. Alkadi (who had managed to stand

up) looked on. Ramirez produced a set of handcuffs and used them to secure Mr. Mazloum's

arms behind his back.

21.    Mr. Alkadi attempted to intervene again while this was occurring, but Defendant

Ramirez yelled at him "Back off! We're police officers!" and both Ramirez and one of the other

off-duty officers/Defendants present pulled out their police badges and showed them to Mr. Alkadi. Mr. Alkadi had seen these individuals drinking at the Nightclub that evening before the assault incident.

22.     While Mr. Mazloum continued to lie face down on the floor, Ramirez, in conjunction with Defendant Persons, began hitting him from behind. As Mr. Mazloum protested, and tried to turn and see who was hitting him, the officer and Persons began punching him in the face as well. As a result of these initial assaults, Mr. Mazloum began to bleed from his face and nose.

23.     Thereafter, Ramirez, together with Persons and one or more of the other off-duty officer/Defendants present, proceeded to drag Mr. Mazloum, who was still handcuffed, out of the room in the Nightclub containing the stage, up a flight of stairs and out of the building onto the street. Mr. Alkadi could not immediately accompany them, because he first needed to find somebody to cover his security position, which took several minutes.

24.     Once Ramirez, Persons, and one or more of the other off-duty officer/Defendants present had forcibly removed Mr. Mazloum from the Nightclub, they dropped him in the street on his back, causing his head to strike the street. At this point, Mr. Mazloum continued to bleed profusely, with blood pouring from his nose. Mr. Mazloum attempted to talk to Defendant Ramirez, informing him that he had done nothing wrong , and asking him why they were assaulting him. In response, Ramirez said "Shut up, you fucking Al-Qaeda," and kicked Mr. Mazloum. Mr. Mazloum informed him in response several times that he was in fact Catholic and not Muslim, despite his Lebanese ethnicity.

25.     When Mr. Alkadi came out of the Nightclub, he witnessed Defendant Ramirez kicking and beating Mr. Mazloum further while Mazloum lay on the ground.

26.     As a result of the assault perpetrated by Ramirez, Persons, Modlin, Phillips, and

Schneider, Mr. Mazloum's shirt was torn and up around his neck and his bare skin was exposed

to the cold ground on a night when the temperature was barely above freezing. He remained

hand-cuffed. All requests by Mr. Mazloum that he be released, or even permitted to cover

himself against the cold, were rejected by calls for him to "shut up." At one point, Mr. Mazloum

tried to stand up from the ground, but Defendant Ramirez grabbed him by his hair and threw him

back, slamming Mr. Mazloum's head against the ground.

### *The arrival of the uniformed police officers: the cover-up begins.*

27.     Eventually, an MPD squad car appeared on the scene, presumably in response to a

telephone call placed by someone at the Nightclub. Two uniformed DC police officers

(Defendants Acosta and Smith) got out of the squad car while Mr. Mazloum was sitting on the

ground. One of the uniformed officer/Defendants present gave his hand-cuffs to Defendant

Ramirez, who then cuffed Mr. Mazloum with the new set, removing his own. Ramirez walked

off to consult in private with the MPD officers who had just arrived, as did Defendant Persons.

28.     Mr. Alkadi overheard Defendant Persons saying that his hand was hurt, and he

wanted to go to the police station to file a complaint against Mr. Mazloum. The uniformed

police officer told him in response that this would be a mistake because of Mr. Mazloum's

battered appearance, and suggested that a complaint might trigger an investigation of the whole

situation.

29.     After talking with Defendants Ramirez and Persons, the uniformed police officers

Acosta and Smith came back, picked Mr. Mazloum up and took him aside. One of the

uniformed officers started asking him questions and requested some form of identification,

which Mr. Mazloum supplied. Mr. Mazloum also explained the entire incident from the start.

9

The questioning officer observed that Mr. Mazloum appeared hurt and was bleeding, but did not ask if Mr. Mazloum was ok.

30.     While Mr. Mazloum was being questioned, Mr. Alkadi approached the police officer who was talking to Mr. Mazloum. The police officer asked him to take Mr. Mazloum home or to the hospital. He thereupon removed the handcuffs from Mr. Mazloum and returned to Mr. Mazloum his identification documents.

31.     In response, Mr. Mazloum insisted that he wanted to file a complaint against the off-duty officers who had assaulted him. The officer told Mr. Mazloum that if he wanted to file a complaint, he would have to be arrested and taken to the police station to make a report. However, when Mr. Mazloum indicated that he still wished to make a report, and was prepared to be arrested, the uniformed police officers refused to take him to the station, or to take any complaint from him, and told him simply to go home. When Mr. Mazloum then got into the back seat of the police cruiser in order to be arrested and taken to the station, so that he could report the misconduct of the off-duty officers, he was physically removed by Officers Acosta and Smith and physically placed inside his own car.

32.     Mr. Mazloum was driven back to his apartment in Virginia by Mr. Alkadi and thereafter continued on to the Inova Alexandria Hospital to obtain treatment for his serious injuries. Mr. Mazloum had a broken nose, bloody left eye, scrapes on his face and ears, swelling on the left side of his neck where he was grabbed, and an assortment of cuts, deep bruises and bumps on his head. His torso and legs were bruised, and his left knee was swollen from where he had been kicked. His wrists were also cut and abraded from where he had been handcuffed. He has continued to have back pain intermittently since the incident.

10

33.    Because of the severity of his injuries and his overall appearance, the admitting physicians at the Inova Emergency Room recommended that he immediately contact the police. Accordingly, two officers from the Alexandria Police Department came to the hospital to speak to Mr. Mazloum about what had happened.

34.    After the Alexandria police officers interviewed Mr. Mazloum, they called the D.C. Metropolitan Police Department to request that D.C. officers come to the hospital to take a report, but no one was sent. The Alexandria officers recommended to Mr. Mazloum that he photograph his injuries and then go to the D.C. Police department later that day to file a report (as he had attempted to do when leaving the Nightclub that morning, before being rebuffed).

### The Police Report

35.    On the afternoon of Saturday, March 12, 2005, Mr. Mazloum, accompanied by Mr. Alkadi and Mr. Abi-Aad, traveled to the 1st District department in D.C. to formally file a complaint about the arrest and beating. As they were entering the building, they recognized Defendant Ramirez, who was at this time in uniform, who was leaving the building. They followed him out and asked him for his name and badge number. In response, Defendant Ramirez said something along the lines of "Didn't you get locked up last night?" Informed of Mr. Mazloum's intent to file a complaint, Ramirez accompanied them back into the police station.

36.    Once inside, Defendant Ramirez (although he had only moments before acknowledged his involvement in the prior evening's assault incident) began questioning Mr. Mazloum about his address, social security number, and other personal information, as well as about the events at the Nightclub. He also had discussions privately with his supervisor, Lt. Pamela Taylor, who later completed the interview of Mr. Mazloum.

11

37.    In the course of the interview at the police station, both Mr. Abi-Aaad and Mr. Alkadi along with Mr. Mazloum were questioned, and both provided written statements to the police. A photograph was also taken of Mr. Mazloum. Eventually, Mr. Mazloum was informed where he should fax his detailed statement, (which he later did) and all three left the station.

38.    Since the time Mr. Mazloum attempted to initiate his complaint with the MPD about the conduct of Defendant Ramirez on March 12, 2005, no disciplinary action has been taken regarding Mr. Ramirez, nor indeed, have any criminal or administrative proceedings been commenced against any of the officers. Mr. Mazloum has had no further discussions with any representatives of the MPD. At one point, he was interviewed by an FBI agent on behalf of the U.S. Attorney's Office in D.C., which was investigating the incident, but otherwise he is aware of no attempts by the MPD to investigate or otherwise remedy the serious and alarming behavior to which he was subjected.

39.    Upon information and belief, it is the stated policy of the MPD in cases of use of excessive force to defer to the United States Attorney's Office (USAO) if that office wishes to bring criminal proceedings. If the MPD in any case wishes to proceed with disciplinary proceedings against an officer, the Memorandum of Agreement between the two governmental entities provides that within three days after getting a written request from MPD, the USAO must either file charges, provide a letter of declination, or indicate the USAO's intent to continue further criminal investigation.

40.    Upon information and belief, the MPD has never issued such a written request to USAO in connection with the beating of Mr. Mazloum, although almost a year has elapsed since the incident occurred.

*Efforts to Thwart Mazloum's Ability to Secure Justice for the Wrongs Done to Him; the*
*Destruction of Critical Evidence.*

41.      On information and belief, after Mr. Mazloum, Mr. Abi-Aad and Mr. Alkadi left

the police station, after filing the complaint against Defendant Ramirez, Ramirez called the

owners/managers of the Nightclub, Defendants Rehman and Fiorito, told them what had

transpired, and discussed with them the importance of destroying the security camera films

which would show the beating of Mr. Mazloum.

42.      Later that evening, Mr. Alkadi was contacted by his employer, "Massoud", and

asked questions about what happened the night before. "Massoud" was upset by the fact that he

had not been consulted before Mr. Mazloum and his friends filed the police complaint.

"Massoud" told Mr. Alkadi that "John" (Defendant Fiorito) and Mike Romeo were very upset,

and wanted to discuss the incident with Mr. Alkadi that night at the Nightclub.

43.      Accordingly, Mr. Alkadi returned to the Nightclub to meet with Mike Romeo and

John Fiorito. Upon his arrival, he was escorted into an office that also appeared to double as a

security center, since it featured a number of video monitors which were displaying live feed

from cameras positioned throughout the Nightclub as well as outside of the building. Also

present were an individual known as "David," who Mr. Alkadi understood to be the head of

security, as well as the bouncer (Defendant Persons) who had initially been involved in the

incident.

44.      Defendant Fiorito appeared to be very angry throughout the meeting and

attempted to downplay the assault Mr. Mazloum had suffered. At one point, he specifically

warned Mr. Alkadi to "tell your friend [Mazloum] he is going to get burned if he continues with

making a claim or filing a lawsuit." John went on to say that Mr. Mazloum had initiated the

altercation by punching officer Ramirez. Mr. Alkadi responded that Mr. Mazloum had been

handcuffed from the outset, and hence could not possibly have punched officer Ramirez or anyone else, adding that the security camera videotapes of the incident from the night before (presumably taken with the video monitoring system contained in the Nightclub office) would reveal that Mr. Mazloum had been beaten while he was incapacitated by the handcuffs. Fiorito responded by saying that "everything is gone" as far as the film from the security cameras was concerned, and reiterated his threat to Mr. Alkadi that Mr. Mazloum would be "burned" if he pursued the investigation further.

45.     All actions on the part of Defendants Ramirez, Modlin, Phillips, Schneider, Acosta and Smith described herein were within the scope of their employment, or in the alternative, were ratified by their employer, Defendant District of Columbia.

46.     All actions on the part of Defendants Persons, Michael Romeo and John Fiorito described herein were within the scope of their employment, or in the alternative, were ratified by their employer, Night and Day Management, LLC.

47.     The actions of all of the individual Defendants described in this complaint were willful, wanton and in reckless disregard of plaintiff's civil, statutory and constitutional rights, thereby entitling plaintiff to an award of punitive damages.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
**(as against Defendants Ramirez, Modlin, Phillips, Schneider, Acosta, Smith, and the District of Columbia)**

48.     The allegations of paragraphs 1 - 47 are incorporated herein by reference.

49.     The U.S. Constitution secures to Plaintiff Mazloum the right to due process and equal protection, and to be free of wrongful arrest or the application of unauthorized, unwarranted, and excessive force by a police officer, pursuant to the Fourth and Fourteenth

14

Amendments. These rights were all violated, as set forth above. In addition, the MPD and the District of Columbia, acting through its agent the MPD, owe a duty to the public, arising under federal law as well as the U.S. Constitution, to properly oversee, train, and control the conduct of D.C. police officers in the manner in which they carry out their official functions, whether on or off duty.

50.    Defendants Ramirez, Modlin, Phillips and Schneider of the MPD improperly and without probable cause or other justification wrongfully arrested and severely assaulted Mr. Mazloum on March 12, 2005 at the Nightclub. This assault was characterized by repeated blows, delivered by kicks and punches, to Mr. Mazloum's body. In addition, Mr. Mazloum was handcuffed and forcibly removed from the Nightclub, then forced to remain outside the Nightclub for an extended period of time without a shirt in frigid temperatures before being released.

51.    Defendants Ramirez, Modlin, Phillips and Schneider invoked the authority of the MPD, expressly identifying themselves as MPD officers to justify their conduct, displaying their badges and using their MPD handcuffs to detain Mr. Mazloum.

52.    The conduct of Defendants Ramirez, Modlin, Phillips and Schneider was not privileged or justified. By interjecting themselves and immediately arresting, then assaulting and beating, Mr. Mazloum, they took no time to ascertain the circumstances in order to determine if such force was called for. In fact, as the subsequent conduct of the uniformed MPD officers indicated, the situation was not even close to dangerous for anyone except Mr. Mazloum. Accordingly, Defendants Ramirez, Modlin, Phillips and Schneider,, in using excessive and unnecessary force, could not have reasonably believed that their conduct comported with constitutional requirements .

15

53.    In light of the above, Defendants Ramirez, Modlin, Phillips and Schneider acted under color of law in depriving Mr. Mazloum of his constitutional right to be free from wrongful arrest and from excessive and unwarranted police force.

54.    The improper and unconstitutional conduct of Defendants Ramirez, Modlin, Phillips and Schneider was, moreover, in accordance with a long-standing custom and practice within the D.C. Metropolitan Police Department of using excessive and unnecessary force and ignoring and/or failing to address instances of police misconduct.

55.    As set forth in the Complaint, both the MPD and the District of Columbia have been aware for several years of rampant and unchecked use of excessive and unnecessary force by MPD police officers, specifically including the use of such force by off-duty officers in bars and nightclubs, resulting in a custom and practice of such conduct which continued to exist as of March 11-12, 2005.

56.    Defendants Acosta and Smith participated in the denial of plaintiff's rights by their tacit acquiescence in the beating plaintiff endured as evidenced by their refusal to take plaintiff's complaint, or to take him to the police station where he could make such a complaint.

57.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, incurred medical expense and loss of earnings, and the deprivation of his statutory and constitutional rights, specifically including his rights under the Fourth and Fourteenth Amendments.

**COUNT II – Assault and Battery**
**(as against Defendants Ramirez, Persons, Modlin, Phillips, Schneider, District of Columbia, and FUR Nightclub)**

58.    The allegations of paragraphs 1-57 are incorporated herein by reference.

59.    Defendants Ramirez, Persons, Modlin, Phillips and Schneider unlawfully and intentionally threatened harm to Mr. Mazloum on March 11-12, 2005 at the Nightclub.

60.    Defendants Ramirez, Persons, Modlin, Phillips and Schneider unlawfully and intentionally struck, beat and kicked Mr. Mazloum severely on March 11-12, 2005 at the Nightclub, causing him severe bodily injury.

61.    The conduct of Ramirez, Persons, Modlin, Phillips and Schneider in striking, beating or kicking Mr. Mazloum was not justified or privileged. Mr. Mazloum engaged in no conduct that would justify assaulting him. Defendants Ramirez, Modlin, Phillips and Schneider, without provocation, interjected themselves into Persons's efforts to remove Mr. Mazloum from the internal stage at the Nightclub. They used excessive and unnecessary force in interjecting themselves into the situation and subsequently beating and kicking Mr. Mazloum after he had been hand-cuffed. This is confirmed by the fact that the subsequently arriving MPD uniformed officers promptly released Mr. Mazloum after their on-site investigation revealed no basis for detaining or arresting him.

62.    Defendants Ramirez, Modlin, Phillips and Schneider are also specifically liable under D.C. Code § 5-123.02, which provides that the use by an officer of unnecessary and wanton severity in arresting or imprisoning a person constitutes assault and battery as a matter of law.

63.    Defendants District of Columbia and FUR Nightclub, respectively, are responsible under the doctrines of *respondeat superior* and ratification for the tortious conduct of Defendants Ramirez, Persons, Modlin, Phillips and Schneider. Defendants Ramirez, Modlin, Phillips and Schneider held themselves out to be police officers in interjecting themselves into

the situation, and in fact referenced their status as police officers as justification therefore, making their conduct also within the scope of their employment.

64.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and the deprivation of his common law rights.

### COUNT III – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985) (as against Defendants Ramirez, Persons, Acosta, Smith, Fiorito, Rehman, Night & Day and District of Columbia)

65.    The allegations of paragraphs 1-64 are incorporated herein by reference.

66.    In different combinations, the Defendants entered into agreements which had, as their ultimate objective, the deprivation of Mr. Mazloum's due process and equal protection rights as guaranteed by the U.S. Constitution.  Upon information and belief, these agreements include the following:

(a)    Defendants Ramirez, Persons, Acosta, Smith, Fiorito, and Rehman/Romeo entered into an actual or tacit agreement that they would take steps to "cover up" the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005, and to block or impede any efforts by Mr. Mazloum to obtain legal redress for that beating. This conspiracy was entered into in order to deprive Mr. Mazloum of his due process and equal protection rights -- by impeding his filing a complaint with the Metropolitan Police Department, and then by making it impossible for him to provide direct photographic evidence of the fact that Defendants Ramirez, Persons, Modlin, Phillips and Schneider had used excessive force in attacking Mr. Mazloum at the Nightclub.    Because the use of excessive force violated not only Mr. Mazloum's constitutional rights under the Fourth and Fourteenth Amendments, but also constituted a violation of D.C. law prohibiting officers from use of unnecessary or wanton severity in the

arrest or imprisonment of any person, as well as police regulations requiring officers to employ no more than the minimum amount of force required under the circumstances, these Defendants desired to impede Mr. Mazloum's efforts to obtain redress for the assault.

(b)     Defendants Rehman/Romeo and Fiorito entered into an actual or tacit agreement with Ramirez that they would take steps to "cover up" the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005, and to block or impede any efforts by Mr. Mazloum to obtain legal redress for that beating. This conspiracy was entered into in order to deprive Mr. Mazloum of his due process and equal protection rights by making it impossible for him to provide direct photographic evidence of the fact that Defendants Ramirez, Persons, Modlin, Phillips and Schneider had used excessive force in attacking Mr. Mazloum at the Nightclub, thus protecting the MPD as well as the Nightclub, which employs both Rehman/Romeo, Persons, and Fiorito, and/or from which they derive financial benefit. Because the use of excessive force violated not only Mr. Mazloum's constitutional rights under the Fourth and Fourteenth Amendments, but also constituted a violation of D.C. law prohibiting officers from use of unnecessary or wanton severity in the arrest or imprisonment of any person, as well as police regulations requiring officers to employ no more than the minimum amount of force required under the circumstances, these Defendants desired to impede Mr. Mazloum's efforts to obtain redress for the assault.

(c)     Defendants Ramirez, Modlin, Phillips, Schneider, Acosta, Smith and the FUR Nightclub entered into an actual or tacit agreement that they would take steps to "cover up" the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005, and to block or impede any efforts by Mr. Mazloum to obtain legal redress for that beating.

67.    The Defendants acted in furtherance of their conspiracy by (i) preventing and discouraging Mr. Mazloum from filing a complaint for police misconduct immediately after the incident, by refusing to either accept his complaint or take him to the police station, (ii) later sharing information with Mr. Massoud about the fact that his employees had assisted Mr. Mazloum in filing a formal complaint with the MPD about Defendant Ramirez's conduct on March 12, 2005; (iii) threatening one of Mr. Mazloum's witnesses directly, and Mr. Mazloum himself indirectly, that they would pay a price if they pursued any complaint against the MPD and/or the Nightclub, and (iv) obstructing justice by destroying videotape evidence from security camera monitors stationed throughout the Nightclub that would have shown Mr. Mazloum being kicked and beaten while handcuffed.

68.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and has incurred medical expense and loss of earnings, along with the deprivation of his constitutional and statutory rights.

### COUNT IV – RACIAL DISCRIMINATION (42 U.S.C. § 1981)
### (as against Defendants District of Columbia, Ramirez, Modlin Philips and Schneider)

69.    The allegations of paragraphs 1-68 are incorporated herein by reference.

70.    Plaintiff Emile Mazloum, Lebanese, is a person of Arab ethnicity , and therefore a member of a protected class.

71.    Defendants discriminated against plaintiff on account of his ethnic identity. Plaintiff was arrested, beaten and ejected from the Nightclub in part or in whole because of his ethnic heritage.  White patrons of the Nightclub are not treated in a similar fashion.

72.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and has incurred

medical expense and loss of earnings, along with the deprivation of his constitutional and statutory rights.

**COUNT V – D.C. Human Rights Act (D.C. Code §§ 2-1401.01 *et seq.*)**
**(as against all Defendants )**

73.     The allegations of paragraphs 1-72 are incorporated herein by reference.

74.     The DCHRA makes it unlawful to deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation wholly or partially for a discriminatory reason based on actual or perceived race, religion, national origin, or personal appearance.  D.C. Code § 2-1402.31.

75.     The DCHRA also prohibits any interference, coercion, or retaliation in connection with a person's (i) exercise or enjoyment of any DCHRA right, or (ii) effort to oppose any practice made unlawful under the DCHRA.  D.C. Code § 2-1402.61.

76.     In singling out Mr. Mazloum for removal from the Nightclub, and then assaulting him without real danger or provocation, Defendants Ramirez, Modlin, Phillips and Schneider clearly discriminated against him on the basis of his race, appearance, perceived religion and national origin.  Mr. Mazloum, who is Middle-Eastern in appearance, was presumed to be a dangerous Arab Muslim and for this reason was forcibly ejected from the Nightclub and beaten by Defendants Ramirez, Modlin, Phillips and Schneider..  Indeed, these individual Defendants' pretext for attacking Mr. Mazloum was revealed when, outside of the Nightclub, Defendant Ramirez angrily called Mr. Mazloum "a fucking Al-Qaeda."

77.     In addition, Defendants Ramirez, Fiorito and Romeo retaliated against Mr. Mazloum once they learned of his intent to initiate a formal police investigation into the propriety of Defendant Ramirez's conduct.  These Defendants became aware of Mr. Mazloum's

21

efforts to vindicate his rights (i) based upon Mr. Mazloum's initial unsuccessful efforts on the night of March 11-12 to file a formal police report with Defendants Acosta and Smith, and (ii) after Defendant Ramirez encountered Mr. Mazloum on March 12, 2005 at the police precinct station where Mazloum was filing his complaint.

78.     Mr. Mazloum's efforts to file a complaint and thus initiate an investigation through the MPD's complaint process were protected activity as a matter of D.C. law.

79.     Mr. Mazloum both directly and indirectly suffered adverse action after he was finally able to initiate his complaint of police misconduct. His friend and witness, Mr. Alkadi, was warned not to proceed. In addition, Defendants Romeo and Fiorito, upon information and belief, took the extraordinary step of destroying the crucial videotaped evidence of the beating Mr. Mazloum experienced in order to protect Fur Nightclub and the individual Defendants from any complaint or legal action which Mr. Mazloum might initiate.

80.     As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and has incurred medical expense and loss of earnings, along with the deprivation of his statutory rights.

### COUNT VI – Common Law Conspiracy
**(as against Defendants Ramirez, Persons, Acosta, Smith, Fiorito, Rehman, Night & Day and District of Columbia)**

81.     The allegations of paragraphs 1 – 80 are incorporated herein by reference.

82.     In different combinations, the Defendants entered into agreements which had, as their ultimate objective, the deprivation of Mr. Mazloum's due process and equal protection rights as guaranteed by the U.S. Constitution, as well as his efforts to obtain redress for torts committed against him. Upon information and belief, these agreements include the following:

(a)     Defendants Ramirez, Persons, Acosta, Smith, Fiorito and Rehman/Romeo entered into an actual or tacit agreement that they would take steps to "cover up" the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005, and to block or impede any efforts by Mr. Mazloum to obtain legal redress for that beating. This conspiracy was entered into in order to deprive Mr. Mazloum of his due process and equal protection rights -- by impeding his filing of a complaint with the Metropolitan Police Department, and then by making it impossible for him to provide direct photographic evidence of the fact that Defendants Ramirez, Persons, Modlin, Phillips and Schneider had used excessive force in attacking Mr. Mazloum at the Nightclub.    Because the use of excessive force violated not only Mr. Mazloum's constitutional rights under the Fourth and Fourteenth Amendments, but also constituted a violation of D.C. law prohibiting officers from use of unnecessary or wanton severity in the arrest or imprisonment of any person, as well as police regulations requiring officers to employ no more than the minimum amount of force required under the circumstances, these Defendants desired to impede Mr. Mazloum's efforts to obtain redress for the assault.

(b)     Defendants Rehman/Romeo and Fiorito entered into an actual or tacit agreement with Ramirez that they would take steps to "cover up" the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005, and to block or impede any efforts by Mr. Mazloum to obtain legal redress for that beating.  This conspiracy was entered into in order to deprive Mr. Mazloum of his due process and equal protection rights by making it impossible for him to provide direct photographic evidence of the fact that Defendants Ramirez, Persons, Modlin, Phillips and Schneider had used excessive force in attacking Mr. Mazloum at the Nightclub, thus protecting the MPD as well as the Nightclub, which employs both Rehman/Romeo, Persons, and Fiorito and/or from which they derive financial benefit.  Because the use of excessive force

violated not only Mr. Mazloum's constitutional rights under the Fourth and Fourteenth Amendments, but also constituted a violation of D.C. law prohibiting officers from use of unnecessary or wanton severity in the arrest or imprisonment of any person, as well as police regulations requiring officers to employ no more than the minimum amount of force required under the circumstances, these Defendants desired to impede Mr. Mazloum's efforts to obtain redress for the assault.

(c)    Defendants Ramirez and the FUR Nightclub entered into an actual or tacit agreement that they would take steps to "cover up" the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005, and to block or impede any efforts by Mr. Mazloum to obtain legal redress for that beating.

83.    The Defendants acted in furtherance of their conspiracy by (i) preventing and discouraging Mr. Mazloum from filing a complaint for police misconduct immediately after the incident, by refusing to either accept his complaint or take him to the police station, (ii) later sharing information with Mr. Massoud about the fact that his employees had assisted Mr. Mazloum in filing a formal complaint with the MPD about Defendant Ramirez's conduct on March 12, 2005; (iii) threatening one of Mr. Mazloum's witnesses directly, and Mr. Mazloum himself indirectly, that they would pay a price if they pursued any complaint against the MPD and/or the Nightclub, and (iv) obstructing justice by destroying videotape evidence from security camera monitors stationed throughout the Nightclub that would have shown Mr. Mazloum being kicked and beaten while handcuffed.

84.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to physical injuries, pain and suffering, and has incurred

24

medical expense and loss of earnings, along with the deprivation of his constitutional and statutory rights.

### COUNT VII – Negligence
### (as against Defendant District of Columbia )

85.     The allegations of paragraphs 1 – 84 are incorporated herein by reference.

86.     Defendant District of Columbia, by its own regulations, prohibits MPD officers and members from the use of excessive force. D.C. Code § 5-123.02 (2005). Accordingly, it owed a duty of care to the general public to take reasonable steps to train and supervise all officers of the Metropolitan Police Department. This level of care was heightened by the fact that the District had been aware for several years that there existed in the MPD a custom and practice of using excessive and unnecessary force, especially by off-duty officers drinking in bars and nightclubs. That duty of care was breached as more specifically set forth hereinafter.

87.     The actions taken by Defendants Ramirez, Modlin, Phillips, Schneider, Acosta and Smith as described above occurred as a result of inadequate training and supervision by their employer, the District of Columbia. Defendants Ramirez, Modlin, Phillips and Schneider were inadequately trained in (a) the use of force, and how and when to avoid the use of force and excessive force, (b) the rights of citizens under the D.C. Human Rights Act, (c) the duties, and responsibilities of off-duty officers, and (d) the duty of police officers to assist and facilitate the filing of complaints from persons who assert that they have been subjected to such unlawful force.

88.     Defendants Ramirez, Modlin, Phillips, Schneider, Acosta, and Smith were all inadequately supervised, thereby causing the action of these Defendants described above.

89.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including physical injuries, pain and suffering, medical expense, loss of earnings, and the deprivation of his common law, statutory and constitutional rights.

**COUNT VIII – Reckless/Negligent Spoliation of Evidence**
**(as against Defendants Rehman/Romeo, the Nightclub, and Fiorito )**

90.    The allegations of paragraphs 1-89 are incorporated herein by reference.

91.    Defendants Rehman/Romeo and Fiorito were aware as of March 12, 2005 that Mr. Mazloum had a potential civil claim against, at a minimum, the Nightclub, Persons, Modlin, Phillips, Schneider and Ramirez based upon the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005.

92.    Defendants Rehman/Romeo and Fiorito had a legal duty to preserve any evidence relevant to Mr. Mazloum's potential claim.

93.    Upon information and belief, Defendants Rehman/Romeo and Fiorito oversaw, authorized, and/or participated in the destruction of videotape evidence from security camera monitors mounted inside and outside the Nightclub that would have shown Mr. Mazloum being kicked and beaten.

94.    Because of the destruction of the videotaped evidence, Mr. Mazloum's ability to prove the allegations of his civil claim has been significantly impaired, as the videotape would have constituted incontrovertible proof of what had occurred both within and outside of the Nightclub; under present circumstances, Mr. Mazloum can only rely on the testimony of eye witnesses and can expect opposing witnesses to present contrary testimony. There is thus a proximate relationship between the destruction of this videotaped evidence and the significant impairment of Mr. Mazloum's ability to prove his case.

26

95.    Absent the destruction of the evidence, there would have been a significantly greater significant possibility of success on Mr. Mazloum's claims, as he could have more easily corroborated the testimony of his witnesses with incontrovertible documentary proof of what occurred at the Nightclub.

96.    The Nightclub is liable for the tortious conduct of its agents Rehman/Romeo and Fiorito under a theory of *respondeat superior.*

97.    As a result of the above-stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to the diminution of his ability to prove his claims.

### COUNT IX – Aiding and Abetting Spoliation of Evidence
### (as against Defendant Ramirez)

98.    The allegations of paragraphs 1-97 are incorporated herein by reference.

99.    Defendants Rehman/Romeo, Fiorito, Ramirez, and the MPD were aware as of March 12, 2005 that Mr. Mazloum had a potential civil claim against the Nightclub, as well as a number of other individuals, based upon the beating of Mr. Mazloum that occurred at the Nightclub on March 11-12, 2005. Accordingly, they improperly and illegally destroyed videotape evidence from security camera monitors stationed throughout the Nightclub that would have shown Mr. Mazloum being kicked and beaten.

100.    Defendant Ramirez assisted in the destruction of the videotaped evidence by alerting Defendants Rehman/Romeo and Fiorito in advance that Mr. Mazloum had filed a complaint based upon the illegal beating he had received from Ramirez on March 11, 2005. This information "tipped off" Defendants Rehman/Romeo and Fiorito to the need to destroy the evidence in question. Defendant Ramirez knowingly informed Defendants Rehman/Romeo, FUR Nightclub, and Fiorito of Mr. Mazloum's complaint for the purpose of assisting in the destruction of this evidence, and knew, or should have known, that the destruction was illegal.

27

101.    Accordingly, Defendant Ramirez knowingly and substantially assisted the destruction of the videotaped evidence.

102.    As a result of the above stated facts, Mr. Mazloum has suffered extensive damages, including but not limited to the diminution of his ability to prove his claims.

**WHEREFORE**, Plaintiff Emile Mazloum prays for judgment as follows:

a.  An award of compensatory damages against all Defendants commensurate with the damages and injuries Mazloum has suffered as a result of the Defendants' collective and separate misconduct;

b.  An award of punitive damages against the Defendants to punish them and deter them and others from engaging in similar behavior;

c.  An award of Plaintiff's reasonable attorneys' fees and costs of suit incurred in this action, to the extent available under applicable law;

d.  An order directing the District of Columbia to proceed expeditiously with disciplinary action against Defendants Ramirez, Modlin, Phillips, Schneider, Acosta, and Smith;

e.  An order directing the District of Columbia to require the Metropolitan Police Department to enforce all now-existing rules and regulations relating to the use of force; and

f.  For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff makes demand for a trial by jury.

Respectfully submitted;

Dated:  March 7, 2006                    /s/ _____
                                         Brian H. Corcoran (Bar No. 456976)
                                         Katten Muchin Rosenman LLP
                                         1025 Thomas Jefferson St., NW
                                         Suite 700 East Lobby
                                         Washington, D.C.  20007
                                         Ph: (202) 625-3500
                                         Fax: (202) 298-7570
                                         Brian.Corcoran@kattenlaw.com

                                         Susan Huhta (Bar No.453478 )
                                         Warren R. Kaplan (Bar No. 034470)
                                         Washington Lawyers' Committee for
                                         Civil Rights and Urban Affairs
                                         11 Dupont Circle, NW
                                         Suite 400
                                         Washington, D.C.  20036
                                         Ph: (202) 319-1000
                                         Fax: (202) 319-1010
                                         Sue_Huhta@washlaw.org
                                         Warren_Kaplan@washlaw.org

                                         Attorneys for Plaintiff
                                         Emile Mazloum